case we will hear is Lance v. Board of County Commissioners, number 197050. Council, you may proceed. Good morning, Your Honors, and may it please the Court. Miigwetch for Plaintiff Appellant Dustin Lance, and I'd like to reserve three minutes for rebuttal. While in pretrial detention, Mr. Lance developed a dangerous and painful condition called preoptism. He was in severe pain for three days, and he took every opportunity to plead with the officers for help. In fact, his condition was so bad that even other detainees were asking for help on his behalf. But the officer defendants did nothing. And it wasn't until the fourth day that a different officer finally took Mr. Lance to see the jail nurse, who immediately recognized the need for care and sent him to the emergency room. Now at the emergency room, the ER physician told the transport officers to take Mr. Lance directly to a second hospital where a specialist was waiting to treat him. But the transfer officers pursuant to a county policy brought Mr. Lance back to the jail, where they instead made him wait while they filled out paperwork, and then left him essentially to find his own way to the hospital. So because of all of these delays, Mr. Lance was not able to get treatment that completely resolved his condition, and he suffers permanent damage. And of course, he was also left in pain for those several days. And so the district court did find that three of the four officers committed a constitutional violation when they denied him access to medical care, but it nonetheless awarded them qualified immunity. And so that's where I'd like to start today. This court said just a couple weeks ago in Quintana that prior to January 2016, so well before the events of this case, it was clearly established that when a detainee has an obvious and serious medical need, ignoring those needs necessarily violates the detainee's constitutional rights. So that's exactly what happened here. In fact, that statement of clearly established law is not novel. It's not something that was just said in Quintana. It has come up over and over in this court's case law. So to go to just one of those cases now, in Sealock, the officer defendant there was told by a detainee that he had chest pain. He saw that person pale and sweating, learned that he had been vomiting, and he did not take that person to the hospital. And he was found to be deliberately indifferent for that inaction. And that's exactly what happened here. So just to take Officer Smead as an example, Mr. Lance told Officer Smead Friday at lunchtime, on the morning of the 16th and 17th, and throughout the weekend that he was experiencing this condition and that he was in serious pain. He even showed Officer Smead his condition at least three times over the course of the weekend. And both the nurse and another officer confirmed that Officer Smead had contemporaneous knowledge of the situation. And still, Officer Smead did not do anything. He didn't call the nurse. He didn't take Mr. Lance to MRHC. And so under this court's case law, he was deliberately indifferent, and he should be concerns more the other individual defendants. And it has to do with the inferences that have been suggested about how they became knowledgeable about the condition. And specifically, what I'm interested in is your telling us what the record shows about how the intercom system worked in the broadcast of the whole tower. Did a jailer have to pick up the phone? How many jailers were in the tower? Could you just give us a few more details about that and confirm that the record confirms that? Certainly, Your Honor. So there was only one officer in the tower at any moment. Sheriff Kearns testified to that. And the tower rang through. So when someone called the tower, it rang through, the jailer in the tower would pick up and could speak to the person making the call. And so just to go a little deeper into the inferences with respect to the other defendants, to take Dakota Morgan as an example, he, by his own testimony, was in the tower between noon and 6pm on the 16th. And that is a time period during which Lance specifically said he called the tower several times and spoke to the officer there. And again, because there's one officer there, because Dakota Morgan said he was there at that time, it's certainly a reasonable inference that he was the one who picked up and spoke to Lance at that time. Is there any evidence that Mr. Morgan knew how long this condition had existed? If the court is asking about Dakota Morgan, I believe Lance did say that he had a hard-on that would not go away, and confirmed that it had been ongoing, that it was extremely painful. As to Edward Morgan, the officer that was told in the morning of the 16th, and then was also in the tower during his next shift, Lance specifically testified that he also told that officer about how much pain he was in, that he had this condition that just would not go away. He had said that in the morning, the first morning on the 16th? For Edward Morgan, he did say that on the morning of the 16th. But I think importantly, with respect to Edward Morgan, the interaction didn't stop there. So he was told certainly the morning of the 16th, and then he worked a second shift the subsequent day. And during that shift, he was in the tower, during which time he did sight checks. And so it was essentially responsible for confirming the welfare of all the detainees during that time. So, you know, I'm sorry, you go ahead. Your Honor, I was just going to say that given that he was in the tower after hearing about this without wearing pants and with this condition visible, that in that context, having already heard about the condition, that would have just been another instance that he would have learned about it. Okay, I understand. How do you reconcile this argument with regard to Tyler Morgan, with the majority opinion in Quintana, where the Chief Judge and Judge Carson said that for two of the officers, Garcia and Gallegos, even though Ortiz's cell was covered in feces and vomit, it was reading too much into the record, even on a motion to dismiss stage, to reasonably infer that Garcia or Gallegos had been privy to the condition of his cell. Isn't this reading inference upon inference likewise applicable here to infer that Tyler Morgan, if he had been, say, going to feed breakfast or doing sight checks, would have happened to have seen him in the day room, for example, walking with an erection. Aren't these the combination of inferences that was impermissible in Quintana? No, Your Honor. I think there's a couple key differences. So first, we have here these Oklahoma jail standards that required the officers to conduct sight checks. And this court said in Lopez v. Lemaster that these standards do provide persuasive authority about what is required by these officers, and that a jury can draw reasonable inferences from that requirement. So these officers, you know, weren't just in the tower. They were required under jail standards to look every hour and make sure everyone was okay. Second, the tower in this case is really, it has these huge open glass windows, and it's essentially two rooms side by side, the day room and the tower. And you can see directly into the day room. It's right in front of you. And the picture is in the record, I believe, at Appendix A663. And so I think here, the inference that the officers, while they were in the tower, would have seen Mr. Lambs is not, it's not an unusual inference to draw. It's something that because of the requirements of their job and the nature of the tower is a perfectly reasonable inference that a jury could draw. Now, why would it be reasonable for Harper? Because that picture was in the daylight. Harper was there in, I think, 11 p.m. to 6 a.m., if I'm not mistaken, where it obviously would be dark. So why is it a reasonable inference that Harper would have been able to see into the day room through that rectangular window? Your Honor, again, I think that would go back to the jail standards. Because under these standards, if the officer is saying that they did these site checks at night from the tower, then they're essentially saying that they could see into the day room, into the pods at night. And so they can't, you know, say that that's true when they were doing their job and saying, signing off on and unless there are further questions on these specific inferences with regard to different officers. Ms. Rom, I'd like to ask you a question about the Monell claim relating to medical OR. When the jail officials took Mr. Lance back to the jail after the McAllister doctor told them to follow a county policy. Your Honor, I believe they followed a county policy there. And there is testimony from Officer Sparks and Sheriff Kearns that the policy required those officers to bring them back, bring detainees back to the jail despite the order by the doctor that he be taken directly to a hospital. Is there any other evidence of a policy besides the Sparks' current testimony? No, Your Honor, that is the evidence of the policy. And I would flag for the court that in Hinkle, a decision that recently came out that on which we filed a 28-J letter, the court there did confirm that testimony from a sheriff and other jail employees suffice to establish that the county had a custom. In that case, it was a custom about strip searches here. Of course, it's the custom about the medical OR policy. And so the testimony from the sheriff of the jail saying essentially that the policy required this is sufficient for a jury to find that this policy existed. Was there any evidence that something like this had happened before? Your Honor, in the record, there is not evidence of a series of events like this in the past. Officer Sparks, I believe, spoke to at least one previous instance of a man who had cancer and oxygen issue and needed to see a respiratory specialist. And he said that person would have still needed to be brought back to the jail before being sent out. But here, we believe the municipality was deliberately indifferent, not because of a pattern of events, but because it was plainly obvious and very predictable that the outcome of this policy was that someone was no way to get to a hospital. So this policy not only required the violation of physician orders, it not only necessarily delayed care by several hours while paperwork was being filled out, but it required the detainees to be essentially left out with no way to get to the second facility. Could I just ask one more question about this particular issue? How would you articulate the Your Honor, I think the underlying violation would be that of all of these officers who denied him access to medical care over an extended period of time. And specifically with regard to the Monell policy, that his pain was prolonged for another several hours because of this policy and also contributed to the permanent damage that he suffered. There is testimony from several medical defendants that the longer you wait with this kind of condition, the more likely it is you have permanent damage. And Your Honors, if there are no more questions, I'd like to reserve the remainder of my time for rebuttal. Thank you, counsel. I think you've got to unmute. I'm sorry, Your Honors. Thank you for the gracious time there. My name is Carson Smith. I'll be arguing for Appellees Mike Smeed and Edward Morgan. Edward was also known as Tyler at the jail for the sake of the evidentiary record. What I've heard this morning from Ms. Ram, in terms of the clearly established prong, I'll start there, is a citation to Quintana for the idea that what we have here in the situation confronting Mr. Morgan was similar enough or there was some kind of parallel with either Olson or in the briefing McGowan and Seelock. However, it's notable that Quintana begins its analysis stating that the Supreme Court has insisted upon actual knowledge. And as we know, that's the essence of deliberate indifference, the inquiry into the mindset at the pertinent time of the I think it's especially- Let me interrupt, but we can find the subjective component if it is objectively obvious, right? We have case law that says that. I believe that's right, Your Honor. However, Quintana does say for the clearly established prong that prior cases must establish the obviousness of that condition. And so, it is not an analysis that takes place in a vacuum because clearly the term obvious could be permissible if you'd pull 10 different jailers, you might get eight or nine different answers. And so, Quintana very- Isn't the issue in Quintana that they were mistaking it for a different problem, which was normal withdrawal symptoms? Correct, Your Honor. And Quintana says based on the case law, the jurisprudential line, those normal withdrawal symptoms did not constitute an obvious condition. In the same way, we have to be disciplined here to find the obviousness of this particular situation to have been reflected in prior cases. And that, there is no valid link here. What about MATA, the gatekeeper function for Mr. Smead? If, in fact, this was a very obvious situation with an erection that was ongoing and the inmate in obvious pain according to other inmates who were calling in and requesting help, can't- Isn't that enough for the jury to be able to infer that Mr. Smead both- that he knew and should have contacted the nurse? Well, first of all, Your Honor, with MATA and Al-Turki, those cases both centered on a medical professional's knowledge. And so, the obviousness inquiry must be disciplined to that particular position, the medical professional. Al-Turki centered on a nurse Robinson that knew about the inmate having diabetes and knew that the abdominal pain could be symptomatic of life threatening internal injuries due to the diabetic condition. And so, MATA and Al-Turki are medical professional cases and they're in opposite here in terms of the medical condition being contingent on at some point along a continuum, the condition becoming a medical need, a serious medical need. And now, Your Honor, you mentioned Mr. Smead. Mr. Smead came in contact with Mr. Lance around lunchtime. And although Ms. Ram and the briefing has tried to inject the idea that Lance communicated excruciating or serious pain, the record doesn't reflect that. The district court found quite clearly with respect to Smead that he was told about the condition, that it persisted, he needed a nurse, and that he was shown Mr. Lance's penis several times. So, with Mr. Smead... In a snicker, right? Correct, Your Honor. That is what... He thought he was playing, right? That's part of it. I'm sorry, Your Honor. Yes, that's what the record reflects in the light most favorable. Now, Mr. Smead, I think we have to be careful to differentiate the knowledge and the circumstances conveyed to Edward Morgan at 5 a.m. on December 16th to those conveyed to Mr. Smead six, seven hours later and then throughout that Friday. Because as we know, we have to assess clearly established law, particularize to the circumstances confronting that officer at that very moment. And so, the assessment with Edward Morgan, the district court found he was only told that Lance took a pill and that he had an erection. With Smead, Smead was told, took a pill, had an erection, needed to see the nurse, and he was shown Mr. Lance's penis. Well, counsel, how would you respond to the fact that Edward Morgan had a shift in the tower? And wouldn't that have provided him additional information? Your Honor, as Ms. Ram said, Edward Morgan did have a shift in the tower. However, as it's been noted, he had the 11 p.m. to 6 a.m. shift, which was the overnight shift. The pod would have been entirely dark at that time. There's no evidence in the record that Lance would have been out in the pod in the early morning hours. Did he use the intercom? Did he use the intercom to the tower during that time? There's no specific evidence in the record as to that, but what there is in the record and what's an undisputed fact is that Lance testified he only spoke with Edward Morgan one time throughout the whole weekend and that he recognized Morgan's voice. And so, that is an unassailable fact that Mr. Lance only talked with Edward Morgan once throughout the entire weekend through any medium, including the intercom. And so, counsel, let me ask you, so you point out that he had the evening shift where it was dark. Ms. Ram, in a reply brief, questions rhetorically, and I'd like you to answer it. Well, then how, if he's charged with conducting sight checks from the tower for the shift, how is he, why isn't that a reasonable inference that prison authorities would have assumed that he is able to see into the day room and particularly, and also into the A pod, if he's doing sight checks from the tower? It seems a little crazy to say, well, he can't see, but he's doing the sight checks from up there. Well, your honor, the key distinction there is the ability to see into the day room versus the ability to see into the individual cells. So, the individual cells are set back along the run from the day room. Certainly, the officer may have had some vision in a dark day room. However, the record reflects there was no ability to see into the individual cells from the tower. Did you argue that in your appellate briefs? We did, your honor, in response to Ms. Fram's appellate opening brief. And so, there was ability to do a sight check, i.e. make sure that there were two individuals there through the glass of the cell, but there was no appreciable and good vision that would have shown either pain or an ability to see his penis when his shirt was untucked throughout the whole weekend. But you're acknowledging that there is enough evidence to reasonably infer that he could have seen into the day room. So, if he was in the day room between 11 p.m. and 6 a.m., you're acknowledging that Tyler Morgan, there would have been enough evidence to sustain a factual finding that he could see the penis in the erect condition if he had been in the day room. No, your honor, because number one, Lance's shirt was untucked. Number two, it would have been very dark. And maybe Lance was in the day room at 2 a.m. or 3 a.m. on December 17th. So, we're straying from the record in the manner that Tyree discusses, and we're kind of building suppositions into the ether. And at this point, I'll transfer the case to Mike Carr. Hello, your honor. Your honors, I appreciate the time. I mean, I would kind of pick up where, are you able to hear me okay? Yes. Okay. About with regard to what they would have been able to see, because I represent Dakota Morgan, as well as in his official capacities. With regard to the qualified immunity, I mean, Dakota Morgan will in the TOW and the court may have inferred to for deliberate indifference on the point of Mr. Morgan. Of course, this isn't spelled out in the court's order. I'm just assuming that that's where he arrives at this, but that he's in the TOW and that he could see into the day room during the daytime period. Now, Mr. Morgan, Dakota Morgan, testified that he didn't receive any calls on the intercom. And that's the only evidence that we have with regard to the intercom usage. But with regard to this condition. Well, that's not exactly right, is it? Because Mr. Lance testified that during the noon to 6 p.m. shift, he specifically recalls that he called into the TOW that day. And I'm sorry, your honor, I didn't mean to infer there was no evidence of that. I mean, the plaintiff testified that he did that. What I'm saying is that Tyler Morgan or Dakota Morgan's testimony is that he did not receive a call on the intercom with regard to that particular point. That he had no actual knowledge of this particular condition. But as in the daytime, in the day room, the testimony that did come out from the plaintiff is that he would be in his boxers. He would have his pants wadded up. You know, and I think he had some down to show people because it was not readily apparent from status at that point in time. So I don't know that. I would say that even if you could see into the day room, that he would have necessarily been or erect or anything that would have been able to make that. And again, you know, well, and if the plaintiff were to spend a lot of time in the cell, then they wouldn't have been able to check from what he was doing at that point in time. And I would state that, you know, simply because he might not have had his pants wadded up, that might be strange behavior. But I don't think, and we spelled this out in the briefing, I don't think it's necessarily indicative of that this man is in great pain or mentioned on the direct argument. I mean, in that case, that there was sweating, very pale. And even in Quintana, they mentioned those things where he was in a very of being in some sort of distress. I don't know that that would be the case here or that there's evidence of it here with regard to these two jailers. Now with regard to Mr. Harper, especially, he had one shift at the end of this segment, I think on the 19th into the 20th or whatever the last day of the of the stay was, and it was at night and he was after breakfast that Mr. that the plaintiff was taken to the to the nurse who then took him to the other. Now with regard to the Monell claim on the policy and procedure, there's no evidence that there is a string of policy and procedure causing constant claims that have been made with regard to a lack of medical care or a denial of medical care. And it's so counsel, let me be clear on your position here. Are you saying that they're there? What happened here? Well, did what happened here violate a policy or did it? Or did they follow a policy? Or are you saying there was no policy? I'm saying there was a policy with the policy with regard to the medical or or taking them to the hospital itself. I mean, there's multiple small policies involved here. So was was was any policy violated? Or did they follow the policy when they took him back to the jail instead of taking him to the hospital? They would have followed the policy. I mean, I mean, I won't say there's other instances, but I don't think that that's in the record. So I won't say it. But I believe that they did follow the policy at that time because they do have to OR him and that requires a judge's signature to do so. So if they followed, if there was a policy that required them to take take him back to the jail and that delayed his treatment, why isn't that a valid Monell claim? There's no evidence in this case that they had this man's record, but the appellee or the I'm sorry, the appellant they contributed to his to his injury. There is plenty of record that had no bearing at all. I mean, can I can I interrupt it now? I'm sorry, I apologize for doing this, but I don't know if it's just me or your Wi-Fi, but I can only understand about every other sentence that you're making. Yes, and that's OK. Well, it's not your fault, but I really want to know what you just said because I was really interested in your answer to Judge Matheson's question. Can you hear me OK now? Am I giving you another 30 seconds to just repeat what you understand? We'll give you a little extra time to to see if see if we can get it all all through. I apologize for that, Your Honor. Can you hear me OK now? So far, OK. Go ahead. The point that I was trying to make is that the comment was made that this slight delay, the two hour delay from hospital. Sorry, from the jail to actually leaving to go. That it would have contributed to his injury or caused his his injury. There's a lot of evidence not in this court's record to indicate that it would have had no impact at all, that his medical condition was sealed days before and that this would not have been causal at all. Counsel, let me just try to restate to make sure we're getting your argument. If I understand what you're saying, that bringing him back to the jail as opposed to taking him straight to the hospital did not contribute to his injury. In other words, it just didn't matter one way or the other. Is that is that what you're saying? That is what the evidence in the case will show, Your Honor. Yes. And also, I mean, let's also remember to just one last thing. I mean, they were told to take him. To take him to the hospital, and then they didn't. They didn't arrive. And errands and didn't get it done. And the nurse's testimony. To her father, to his father, that he needed to go to the hospital. Well, let's say this 150 miles from McAllister to Tulsa, right? To get to St. Francis, correct? I mean, it's not like it's going down the street, right? I'm sorry. Mr. Carr, I think we lost you. You lose me again. I'm sorry. You're back. You're back. I'm not touching anything. I promise. I'm just that's fine. We're making that we're doing the best we can. I think it's coming through for the most part. But why don't you go ahead and answer Judge Bacarach's question? 50 miles between. Yes. So it's a doctor. Lee says that his testimony in deposition is he told the jailers that you need to take him directly to St. Francis in order for him to have a realistic chance. That's his testimony, right? I believe it was Dr. Lee. State the seriousness that he needed. All right. And what you just said, I'm sorry. And what you just said a minute ago is that time clearly was of the essence because you're now making an extra record argument for the first time that he it was already too late, notwithstanding what Dr. Lee said. So time was clearly of the essence based on the argument that you just make, right? That is. That's right. We can't hear you. Could you say it again? He told him to take the J. He told the jailer. Okay. So let's say let's say assume that Mr. Lance doesn't have a vehicle. So if he gets one ride from his. And so you're saying that even though the jailers do, you're saying that that everybody knew that it was arguably even too late at that point to bring him back, contrary to the doctors in specific instructions to the jailers in in conformity with a policy to say that that you need to be bring somebody back in all circumstances to be medically award. So the county doesn't have to foot the bill for St. Francis. You're saying that that that well, it's it's his fault that the one ride he could get was from his father. And it's just bad luck that he had grandkids that needed somebody to sit with him before he could take him one hundred and fifty miles from a calendar, the Calister to Tulsa. So so it's his fault that it took so long. Is that your argument? No, I'm not saying it's his fault. I'm saying that whether it was the delay from the jail or the. That delay, that particular piece of time, it wouldn't have made any causal difference whatsoever to this man's care and that that would be that's our position because because the damage is done. The damage wasn't done, though, at the point that Dr. Lee said, get that guy to St. Francis now. The test, OK, I mean, that is what Dr. Lee said. Dr. Lee is not a urologist and Dr. Lee was unable to fix it. But yes, the guy, the urologist at St. Francis is the guy that told Dr. Lee, get him there right now. Right. Is that right? That is right. OK. All right. Counsel, I think we've we've gone over time a bit, but I think we needed to do that to make we understood your points. And I think despite a little choppiness that that we've we've we understand your your position is wrong. You'll have to unmute and and do your rebuttal. We'll give you a little extra time because Mr. Carr is given a little extra time. But why don't you go ahead and proceed? Thank you, Your Honor. I'd like to make just a couple of points in response. So first, I believe Attorney Smith said that Mata could not clearly establish the law here because it concerned a medical professional. But I would note that just a couple of weeks ago in Quintana, the court found that a layperson, a detention officer was deliberately indifferent and not entitled to qualified immunity. And it relied for that proposition on Mata case about medical professionals. So I think when when the court has done a gatekeeper analysis, it has relied on cases about medical professionals to establish the law in cases about detention officers. And of course, in this case, that's not even necessary because Seelock, McCowan and Olson, all cases that concern detention officials, clearly established the law here. But if the court wishes, it could also rely on Mata for that reason. I also want to note that the attorneys Smith and Carr said quite a bit about not necessarily being able to see someone from the tower. But several detainees testified that the condition was very obvious that he had a visible erection that was walking around, obviously in pain. In fact, even Officer Sparks said, quote, you could tell on his expression and everything that he was visibly in pain. The nurse confirmed that he appeared to be in a great deal of pain. So we have testimony from other detainees from other employees that this was an obvious condition. And then third, I'd like to go to the Monell claim. I think your honors underscored how causally related the medical or policy was to this condition, the permanent nature of the condition that he must now deal with every day. But on top of that, the medical or policy led to several additional hours of pain, which in itself is a very serious concern. And finally, your honor, I see I have 30 seconds left. I'd like to address our final Monell claim on training. There were absolutely no relevant trainings provided to the officers here. And when you lock people up over a weekend, every weekend, every evening without medical professionals and without people that are trained to deal with this will happen. And so with that, thank you, your honors. We ask that the court remand and reverse reverse and remand. All right. You you hit the deadline right on target. So, counsel, thank you very much. We appreciate the arguments this morning. The case will be submitted and counsel are excused. Thank you.